**Lewis COLTEN, Appellant,**

**v.**

**COMMONWEALTH of Kentucky, Appellee.**

Court of Appeals of Kentucky.

May 21, 1971.

Alvin L. Goldman, Lexington, for appellant.

John Breckinridge, Atty. Gen., James H. Barr, Asst. Atty. Gen., Frankfort, for appellee.

CULLEN, Commissioner.

Lewis Colten was convicted in the Fayette Quarterly Court of a violation of the Kentucky disorderly conduct statute, KRS 437.016, and was fined $10. He appealed to the Fayette Circuit Court where he was tried de novo (without a jury, it having been waived) and again was found guilty, but the fine was increased to $50. Colten appeals to this court from the circuit court judgment.

The circuit court found Colten guilty of violating paragraph (f) of KRS 437.016 (1). That paragraph, with an introductory phrase designed to be read with it, is as follows:

"A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:

\* \* \* \* \* \*

"(f) Congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse \* \* \*"

Colten's two leading contentions are (1) that the statute is unconstitutional and (2) that even if the statute be held constitutional the Commonwealth failed to prove the elements of the offense proscribed by the statute. We shall give consideration first to the question of the sufficiency of the proof, because to do so enables the opinion to be commenced with a full statement of the facts and because we think that the question of constitutionality should be considered in the light of the facts of this case, not in the abstract. In measuring the sufficiency of the proof we shall of course view the evidence most favorably to the Commonwealth, and in stating the facts we shall state only the Commonwealth's version where there was probative evidence to support that version. Pearson v. Commonwealth, 295 Ky. 616, 175 S.W.2d 33; United States v. Smith, 6 Cir., 399 F.2d 896.

On March 3, 1970, Mrs. Richard M. Nixon (the First Lady) was in Lexington, Kentucky, to make a public appearance. When the appearance was concluded she was driven to the local airport to make her departure from Lexington. A substantial crowd was in attendance at the airport. Among those present were Colten and some 15 to 20 other college students who had attended in a group for the purpose of conducting a demonstration to protest against the program which Mrs. Nixon had advocated and to show support for the group's gubernatorial candidate. Colten was a leader and spokesman for the group.

As Mrs. Nixon's plane was preparing to depart the group engaged in some form of demonstration on the lawn of the airport, which one of the Commonwealth's witnesses described as "a whooping and hollering party." The police who were present in strength by reason of the importance of the visitor and the crowd her presence had gathered, did not disturb the demonstration.

After Mrs. Nixon's plane had departed, the crowd at the airport began to leave. Colten's group got into their automobiles and formed a procession of some six to ten cars proceeding along the access road toward the main highway. A state police officer, John Miller, had observed that one of the first cars in the procession carried an expired Louisiana license plate, and he directed the driver, one Mendez, to pull his car off the road onto the right shoulder. When Mendez complied, Colten and the other members of the procession also pulled

their cars off the road onto the shoulder. They all got out of their cars and Colten pursued inquiries as to the cause of the stopping of the Mendez car, while the others in the group, some 15 in number, stood around *in the roadway*.

Colten approached Officer Miller and asked why he had stopped the Mendez car. Miller told him that the car bore expired license plates, that he was not arresting Mendez but was giving him a citation, and that the car would be towed in to the city. Colten continued to endeavor to engage Miller in conversation, and to offer advice to Mendez, until Miller got into his patrol car with Mendez and rolled up the windows to shut out Colten's interference. Colten continued to remain in the area of the patrol car. His testimony was that he wanted to counsel Mendez as to a possible ground for relief from the citation and he wanted to arrange for passage to Lexington for Mendez and the latter's passengers. The evidence warranted the inference, however, that Colten's real intent was simply to aggravate, harass, annoy and inconvenience the police, for no purpose other than the pleasure of aggravation, harassment, annoyance and inconvenience. He had been told by Officer Miller the cause of the stopping of the Mendez car, that Mendez was not being arrested, but that the car would be towed in. The fact that the license plate was expired was obvious. There was no occasion for further discussion or advice. Arrangements could have been made promptly for passage for the passengers in the Mendez car, who were under no detention. A simple word to Mendez that someone would wait down the road for him would have taken care of passage for Mendez. Instead, Colten, a leader of a group who had no interest at all in remaining at the scene, by his continued presence encouraged and led the others to stay, blocking a traffic lane and causing inconvenience and annoyance to other travelers. The presence of the Colten group caused other police officers to stop. A state police captain ask-

ed the group four or five times to leave. Another officer twice asked Colten to leave. A third officer, Harlowe, three times asked Colten to leave. Each time Colten offered some excuse. Finally, after the third request was not complied with, Officer Harlowe arrested Colten for disorderly conduct.

Arguing the insufficiency of the evidence to establish a violation of the statute, counsel for Colten says first that there was no proof of a lawful order to disperse; no proof of any need or purpose for an order to disperse. In making this argument counsel treats the situation as if Colten were a lone individual causing no trouble, not blocking traffic, merely trying to be of help to his friends in the Mendez car. The evidence, however, presents an entirely different picture of the situation, with Colten as the leader of a group of some 15 persons who created inconvenience and annoyance by standing in the roadway, parking their cars so as to require police to stop their patrol cars on the roadway, forming an assembly for no purpose other than to aggravate, annoy, harass and inconvenience. Perhaps the inconvenience and annoyance were not great, but their extent was substantial when measured against the complete absence of any legitimate objective for the assembly.

Counsel next says that there was no proof of a refusal to disperse. We think the evidence, outlined above, fully warranted the inference that Colten's statements that he would leave *after* he had made arrangements for passage for the people in the Mendez car were simply disguised *refusals* to leave.

Counsel further says that there was no proof of an intent to cause public inconvenience or annoyance. As hereinbefore noted, we are of the opinion that the intent was clearly inferable from Colten's actions in continuing to remain at the scene, with his group, after any legitimate excuse for so doing had ceased to exist. The group was in fact causing inconven-

ience and annoyance, and it is reasonable to infer that this was the sole intent.

We come now to the question of constitutionality of the statute. In our approach to that question we shall be concerned primarily with the statute as applied to the facts of this case, not as it might be applied in some imaginary or hypothetical situation. See O'Leary v. Commonwealth, Ky., 441 S.W.2d 150.

Appellant asserts that the statute is unconstitutional because of (1) overbreadth and (2) vagueness. Overbreadth is claimed to exist in that the statute employs means that stifle or chill the exercise of constitutionally protected freedoms when the end could be more narrowly achieved. See Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231; Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444; Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510. Vagueness is asserted in that the statute is drawn in language so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application. See Connally v. General Construction Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322. It is our opinion, however, that the statute, *reasonably construed,* is not faulty in either of the claimed respects. Cf. O'Leary v. Commonwealth, Ky., 441 S.W.2d 150.

As reasonably construed, the statute does not prohibit the lawful exercise of any constitutional right. We think that the plain meaning of the statute, in requiring that the proscribed conduct be done "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof," is that the specified intent must be the *predominant* intent. Predominance can be determined either (1) from the fact that no bona fide intent to exercise a constitutional right appears to have existed or (2) from the fact that the interest to be advanced by the particular exercise of a constitutional right is insignificant in comparison with the inconvenience, annoyance or alarm caused by the exercise. The

Supreme Court, in Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L. Ed.2d 697, recognized that the right of freedom of speech may be required to yield where its exercise is likely to produce a clear and present danger of a serious substantive evil, and although the Court classified such an evil as one "that rises far above public inconvenience, annoyance, or unrest" we do not believe that the evil must be one that rises far above inconvenience, annoyance or alarm where the particular exercise of the right of speech falls far below the level of minimum social value. We think it is a matter of balancing of interests and that where the interest which the individual seeks to advance through exercise of freedom of speech is minuscule in comparison with the public's interest in being protected from the consequences of that exercise, the public's interest should prevail even though the harm the public might be exposed to is no more than inconvenience or annoyance. For example, if a person were to arise in the audience at a symphony concert and proceed in a loud voice to state at length his belief that Leghorn chickens are prettier than Plymouth Rocks, or some similar inanity, reasonable minds surely would agree that the interest of the public against being so annoyed would far outweigh any possible interest of the speaker to be served by that particular exercise of the function of speech.

If the lack of redeeming social value is a basis upon which the right of freedom of speech may be required to yield to the protection of contemporary standards of morality (see A Book Named "John Cleland's Memoirs of a Women of Pleasure" v. Attorney General of Com. of Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1), it would seem that the public's interest in being protected from inconvenience, annoyance or alarm should prevail over any claimed right to utter speech that has no social value.

We see no reason to engage in the making of fine distinctions between

"speech" and "nonspeech" elements as was done in United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672. Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697, recognizes that pure speech may be suppressed in the public interest if the danger to the public is great enough. And it is axiomatic that private rights must yield to a reasonable exercise of the police power. 16 Am.Jur.2d, Constitutional Law, secs. 286, 287, pp. 556 to 560; Bowling v. City of Somerset, Ky., 333 S.W.2d 769.

In the language of Rowan v. United States Post Office, 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736, we think it is a matter of "Weighing the highly important right to communicate * * * against the very basic right to be free from sights, sounds, and tangible matter we do not want * *." The government's "important or substantial governmental interest," required by *O'Brien* to exist as a basis for regulation in the area of First Amendment freedoms, is relative to the importance or substantiality of the particular purported exercise of one of those freedoms.

We subscribe fully to these expressions in Cox v. Louisiana, 379 U.S. 536 at 554, 85 S.Ct. 453, at 464, 13 L.Ed.2d 471:

" * * * The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. A restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some

civil right which, in other circumstances, would be entitled to protection. * * *"

In the instant case the evidence warranted the conclusion that Colten was not undertaking to exercise any constitutionally protected freedom. He was not exercising the right of freedom of speech because that right is concerned with expression of thought or dissemination of idea. See Smith v. California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205. Colten was not seeking to express a thought to any listener or to disseminate any idea. He simply was trying to irritate the police by his presence and by efforts at interruption. Nor was he exercising the right of peaceable assembly, because that right, we believe, contemplates that the assembly is for some bona fide purpose other than merely to assemble, and Colten's group appears to have had no purpose other than to cause inconvenience and annoyance. So the statute as applied here did not chill or stifle the exercise of any constitutional right.

As concerns the argument of vagueness, we think our holding in O'Leary v. Commonwealth, Ky., 441 S.W.2d 150, is fully applicable. We believe that citizens who desire to obey the statute will have no difficulty in understanding it, relying, as they are entitled to, that the statute will be construed sensibly and reasonably. It is true that the statute does not attain idealistic perfection in preciseness, but it is fully as precise as some of the language of the Bill of Rights. We do conceive that the defining of prohibited conduct must be more precise than the defining of a right of conduct. To illustrate: If "peaceably" is a sufficiently precise word in the First Amendment's guarantee of the right of assembly, should "nonpeaceably" be considered too vague in a statute describing the kind of assembly that is prohibited?

It is our conclusion that the statute is not void for overbreadth or vagueness. In this view we are supported by the decision of the three-judge federal district court in Muskat v. Goff, Civ. No. 6532, March 26, 1970 (W.D.Ky.).

The appellant makes a third contention, that the evidence shows discrimination in the enforcement of the disorderly conduct statute, in that Colten was arrested solely because he wore a beard, long hair and "hippie" clothes, and because he and his group had demonstrated on the airport lawn. In our opinion the evidence does not require that conclusion. In view of the fact that Colten and his group were permitted to make their demonstration without interference, and in view of the fact that the police quietly and courteously asked Colten ten times to leave, before arresting him, we think a finding of discrimination in making the arrest hardly would be warranted, much less required. Colten complains of the fact that the arresting officer called him a "loudmouth" when making the arrest, but we think this complaint comes with little grace from a man who argues in his brief the right of a citizen to call policemen *and their wives* "pigs." The evidence warrants the conclusion that Colten was in fact a "loudmouth," which fact tends to show an *absence* of discrimination in the enforcement of the statute against him, because "loudmouths" are the class of persons who ordinarily would commit violations of the statute.

The appellant's final contention is that the imposition by the circuit court, on appeal from the quarterly court, of a fine higher than that imposed by the quarterly court, constituted a violation of due process, under the rationale of North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2089, 23 L.Ed.2d 656. For the reasons stated by this court in Brooks v. Commonwealth, Ky., 447 S.W.2d 614, and for additional reasons hereinafter stated, we think the contention is not valid. *Pearce* stands for the proposition that a defendant's right, by appeal, to obtain relief from *errors* upon a trial, cannot be impaired or fettered by the fear of receiving a greater penalty on a new trial, by way of retaliation for his having taken the appeal. Under our system of justice the inferior courts are not designed or equipped to conduct error-free trials, or to insure full recognition of constitutional freedoms. They are courts of convenience, to provide speedy and inexpensive means of disposition of charges of minor offenses. The convenience is for the benefit of the accused as well as of the Commonwealth. An accused who wants a full-blown trial, in a court of general jurisdiction designed to give full protection to his rights, may appeal to the circuit court and obtain a trial de novo. If he so desires, he need not undergo the bother of a trial in the inferior court, for he can plead guilty there and still appeal to the circuit court. Brown v. Hoblitzell, Ky., 307 S.W.2d 739. The question of whether there was *error* in the quarterly court is irrelevant. The "appeal" to the circuit court from the quarterly court is not an appeal in the sense of *Pearce*. It simply is an election to have the case determined by a court of general jurisdiction rather than by a court of convenience. We do not believe that *Pearce* intends to say that a state cannot put some price on the accused's privilege of a choice of courts as distinguished from pricing the right to obtain a fair trial in one court which the state fixes as the sole forum.

The judgment is affirmed.

All concur.